**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

**v.**                                                                                    **15-cr-00070-DHU**

**CARLOS DAVENPORT,**

     **Defendant.**

**<u>MEMORANDUM OPINION AND ORDER</u>**

Carlos Davenport, currently incarcerated at Federal Correctional Institution Florence, Colorado ("FCI Florence"), seeks compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). *See* Doc. 74 (Supplemental Motion to Reduce Sentence under 18 U.S.C. 3582). To support his motion for compassionate release, Mr. Davenport cites his family circumstances, that his mother and two disabled brothers are in medical crises, as extraordinary and compelling circumstances warranting his early release. *See* Doc. 74. For the reasons set forth below, the Court **GRANTS** Mr. Davenport's request, reducing his term of imprisonment to time served.

**BACKGROUND**

On January 8, 2015, Mr. Davenport and a codefendant were indicted and charged with (1) conspiracy to distribute 500 grams and more of a mixture and substance containing methamphetamine; (2) possession with intent to distribute 500 grams and more of a mixture and substance containing methamphetamine and aiding and abetting in violation of 18 U.S.C. § 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2; and (3) using and carrying a firearm in relation to and in furtherance of a drug trafficking crime and aiding and abetting in violation of 18 U.S.C. §

924(c) and 18 U.S.C. § 2. Doc. 14. On June 17, 2015, Mr. Davenport pled guilty to counts one and three of the Indictment. Doc. 39.

The details of the crimes that Mr. Davenport pled guilty to are as follows: on September 12, 2014, surveillance was conducted on Carlos Davenport as a part of an ongoing investigation. PSR ¶ 7. A confidential human source ("CHS") was used to purchase two handguns from Defendant. *Id.* On September 22, 2014, a CHS was used to purchase another handgun and a quantity of methamphetamine. PSR ¶ 8. On October 7, 2014, a CHS was again used, and a handgun was dropped off. PSR ¶ 9. On December 3, 2024, two CHS were used to purchase two pounds of methamphetamine. PSR ¶ 10. After some back and forth between Mr. Davenport and agents who approached him after witnessing these CHS purchases, he agreed to speak with them and his car was searched. PSR ¶ ¶ 14, 15. Mr. Davenport was then arrested.

In the PSR, Mr. Davenport's base offense level was determined by the sentencing guideline for 21 U.S.C. § 846, which provided that an offense involving 3,559 grams of methamphetamine actual had a base offense level of 36. PSR ¶ 23. Three points were removed for his acceptance of responsibility. PSR ¶ ¶ 30, 31.  Mr. Davenport had a fairly extensive criminal history, which resulted in a subtotal criminal history score of six. PSR ¶ 39. Two points were added because Defendant had committed the instant offense while under a criminal justice sentence for a supervised release revocation in December of 2014, resulting in a total criminal history score of eight. PSR ¶ ¶ 40, 41.

As a result of these charges and the calculations of his PSR, Mr. Davenport was subject to two statutory mandatory minimum sentences, and the five-year mandatory sentence for count three was required to run consecutively to any other sentence he received. Ultimately, he was

2

sentenced to a total of fifteen years, or 180 months, by the Hon. Judge James A. Parker. Doc. 39, 56.

On April 10, 2023, Mr. Davenport filed a Motion to Reduce Sentence under 18 U.S.C. 3582 and the First Step Act of 2018. *See* Doc. 65. He filed this motion pro se. The Court appointed counsel on July 14, 2023, and ordered counsel to file a supplemental motion. *See* Doc. 70. On August 29, 2023, Mr. Davenport's counsel filed a Supplemental Motion to Reduce Sentence. *See* Doc. 74. The government responded on September 13, 2023 (Doc. 75) and Mr. Davenport filed his reply on September 27, 2023 (Doc. 76). At the time that the motion for compassionate release was filed, including good time, Mr. Davenport had served over 130 months, or more than 72% of his total sentence. The motion was filed on August 29, 2023, which means that at the time of this memorandum Mr. Davenport has served *at least* 138 months. With whatever additional good time he has accrued since the filing of this motion,[1] Mr. Davenport has served 76% of his total sentence. This Court held a hearing on the motions on May 22, 2024. Mr. Davenport appeared telephonically, and his mother, Hortencia Davenport, also spoke at the hearing, appearing in person.

## LEGAL STANDARD

For motions filed under § 3582(c)(1) the Tenth Circuit has developed a three-step test to determine whether compassionate release is appropriate: if "(1) the district court finds that extraordinary and compelling reasons warrant such a reduction; (2) the district court finds that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission; and (3) the district court considers the factors set forth in § 3553(a), to the extent

---

[1] The Court is unaware of the current good time Mr. Davenport has accrued since the filing of his motion as no party informed the Court of the updated good time amount at the May 22, 2024, hearing.

that they are applicable." *United States v. Maumau*, 993 F.3d 821, 831 (10th Cir. 2021). While there are no applicable policy statements from the Sentencing Commission,[2] Courts in this Circuit often look to the United States Sentencing Guidelines §1B1.13 for non-binding guidance on what is considered to be "extraordinary and compelling circumstances." *See United States v. Carr*, 851 F. App'x 848, 853 (10th Cir. 2021). §1B1.13 outlines various factors which can be considered by the Court: medical circumstances of the Defendant, age of the Defendant, family circumstances of the Defendant, and if the Defendant was a victim of abuse while incarcerated. *See* United States Sentencing Commission, Guidelines Manual, § 1B1.13.

## DISCUSSION

**A. Mr. Davenport's family circumstances, in which three of his close family members are suffering medical crises and need immediate long-term assistance, is an extraordinary and compelling circumstance that supports his compassionate release.**

In his motion, Mr. Davenport argues primarily that he should be released because of his family circumstances. Mr. Davenport's mother, Hortencia Davenport, is the sole caretaker of Mr. Davenports two adult brothers, Lupe, aged sixty-one, and Arturo, aged fifty-two, who both suffer from developmental disabilities which give them the mental functioning of approximately twelve years old. Doc. 74 at 7; Doc. 76.1 at ¶ 4. His brothers are both six-feet tall and weigh over two-hundred and fifty pounds, and Mrs. Davenport has to physically assist them with all aspects of their daily lives, in addition to constantly driving her sons to doctors' appointments and to pick up their medication. *Id.* Mrs. Davenport is now seventy-four years old and is in declining health.

---

[2] Currently the applicable policy statements only apply to motions filed by the BOP. *See United States v. Maumau*, 993 F.3d 821, 836-7 (10th Cir. 2021) ("thus, the Commission has been unable to comply with its statutory duty of promulgating a post-First Step Act policy statement regarding the appropriate use of the sentence reduction provisions of § 3582(c)(1)(A)(i)" and "that the Sentencing Commission's existing policy statement is applicable only to motions filed by the Director of the BOP.")

She suffers from high blood pressure, thyroid issues, arthritis, a fractured clavicle and tears in her shoulder. *Id.* The latter two health issues require surgery which Mrs. Davenport has been putting off in order to continue to care for her children, but "without the surgery … Mrs. Davenport will continue to be in constant pain and her shoulder injuries will continue to worsen." *Id.* Mr. Davenport argues that he is the only available caregiver for his two brothers and his mother post-surgery.

The government argues that Mr. Davenport's family needs do not rise to the standard of extraordinary and compelling circumstances. The government concedes that the incapacitation of Mrs. Davenport and the need to care for his brothers would likely be included under § 1B1.13's definition of "extraordinary and compelling reasons," but that Mr. Davenport has "not established that his mother's anticipated temporary incapacitation supports the extraordinary remedy of permanently reducing his sentence to time served." Doc. 75 at 7. The government argues that Mrs. Davenport's incapacitation may be "temporary" and therefore he has not met his burden and a "more appropriate mechanism" like having one of Mr. Davenport's sisters come and care for his mother and brothers would be sufficient. *Id.*

Under the Sentencing Guidelines for § 1B1.13(C), "the incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner" is an example of an extraordinary and compelling reason to release a person from their term of imprisonment. *See* United States Sentencing Commission, Guidelines Manual, § 1B1.13(C). In addition, § 1B1.13(D) outlines that release may be appropriate where "the defendant establishes that circumstances similar to those listed in paragraphs (3)(A) through (3)(C) exist involving any other immediate family member or an individual whose relationship with the defendant is similar in kind to that of an immediate family member, when the defendant

would be the only available caregiver for such family member or individual. For purposes of this provision, 'immediate family member' refers to any of the individuals listed in paragraphs (3)(A) through (3)(C) as well as a grandchild, grandparent, or sibling of the defendant." *Id.* at § 1B1.13(D).

Given the standards set forth by the Tenth Circuit and the Sentencing Commission's guidelines, the Court finds that Mr. Davenport has met his burden of establishing that his family circumstances represent extraordinary and compelling reasons to reduce his sentence. Two of Mr. Davenport's family members require *immediate* caregiving, and his elderly mother will soon require caregiving as well. Mrs. Davenport has high blood pressure, a thyroid condition, arthritis, and injuries to both her shoulders. Doc. 65, at 4; Ex. D-1. She has a non-displaced fracture in her clavicle in her right shoulder that requires surgery. *Id.* She has "mild to moderate osteoarthrosis in her right AC joint." *Id.* She has tears to her left shoulder. *Id.* The Court had the opportunity to hear from Mrs. Davenport herself at the May 22, 2024, hearing and she helped illustrate the gravity of the situation with her children and herself. One of her children had a kidney removed, and then had another surgery to resolve a hernia.[3] However, blood is still pooling in the herniated area, and he recently had to have a quart of blood removed.[4] This problem will likely repeat itself and he will continue to need medical care for it. His mother told the Court, "he's had several surgeries, and he's a large man. He's very heavy for me to deal. I've been struggling with this for

---

[3] Mot. Hr'g Tr., May 22, 2024 at 33:20-22. This Order cites to the court reporter's unofficial transcript. All page citations are subject to change on the official edited version of the transcript.

[4] *Id.* at 34: 1-3.

while."[5] Her other disabled son now has an injury to his ankle, in addition to his other health issues, making Mrs. Davenport's need for assistance with her two full grown sons more dire.[6]

Since the filing of his motion nine-months ago, Mrs. Davenport has severely injured her hip, and now even doing minimal caregiving of her children puts her into extreme pain. When the Court asked if the hip injury prevents her from being able to take care of her two sons, she explained: "I do it with great sacrifice and pain."[7] Her children require help for many tasks: they are unable to dress themselves, bathe themselves, prepare their meals, clean, do laundry, and to go anywhere outside the house, like to their doctor's appointments or grocery shopping. *Id*. When the Court asked her how critical she thought it was to have extra help with them, she said that "it was absolutely necessary."[8] She also explained that she simply will not be getting the surgery that could alleviate her own suffering until she knew for certain that there would be someone to care for her sons Lupe and Arturo. When the Court asked her about her impending shoulder surgery, she replied, "so far I have refused to do the surgery because of the circumstance. I'm just taking very strong painkillers for the moment."[9] The government asked Mrs. Davenport if her daughter, Carmen Marquez, could provide assistance. She responded that her daughter could not help her on a full-time basis, and that she needs someone to be able to help at the home all the time.[10]

---

[5] *Id.* at 33: 18-20.

[6] *Id.* at 34: 24.

[7] *Id.* at 34: 16.

[8] *Id.* at 34: 23.

[9] *Id.* at 35: 8-11.

[10] *Id.* at 35: 6-23.

The Court rejects the government's argument that one of Mr. Davenport's sisters could come take care of her brothers. Lily Crespo, one of his sisters, in a sworn statement made to this Court in an affidavit, explained that she is unable to take on this caregiving role. As she explains, "both Lupe and Arturo require full-time care, including the need for assistance with daily tasks and sometimes physical assistance as well. They also require transportation to their medical appointments and assistance with their prescriptions." Doc. 76.1 at ¶ 4. Mrs. Crespo lives with her husband and family in El Paso, Texas, so she is too far from Albuquerque to care for her brothers without relocating. *Id.* at ¶ 12. She is also unable to relocate to Albuquerque because she provides full time care for her four grandchildren aged two months, three years, eleven years, and fourteen years, and she also provides care for her mother-in-law who suffers from various adverse health conditions. *Id.* at ¶ 13. Defendant's other sister, Carmen Marquez, is also unable to be a caretaker for Lupe, Arturo, and Mrs. Davenport. As she explains in her affidavit, Ms. Marquez suffers from her own "serious, health issues." Doc. 74, Ex. B at ¶ 12. Due to these health issues, she is unable to drive and therefore she cannot ensure that her brothers or her mother are able to get to their important medical appointments. Given these facts, the Court is convinced that Mr. Davenport has demonstrated that he is the "only available caregiver" to care for the incapacitation of his mother and siblings.

The government also made the argument at this Court's hearing that Mrs. Davenport's incapacitation would not be permanent, and that her incapacitation has not started yet, and therefore this situation does not warrant his release. However, the Court is not convinced by this argument for two reasons. First, nowhere in the sentencing guidelines or the Tenth Circuit's jurisprudence is there a mandate that the incapacitation must be permanent in order to satisfy extraordinary and compelling circumstances. Surely, the incapacitation of a seventy-four-year-

old woman after serious surgery will prevent her from caring for her two sons who have severe disabilities and need care to accomplish everyday tasks. The Court will not hold that any period in which two disabled people will be completely uncared for, or a period in which an elderly woman continues to live in excruciating pain in order to care for her sons, is not a compelling reason to release Mr. Davenport even if that period of suffering for his family members is undetermined at this time. Second, waiting for Mrs. Davenport to have her surgery *before* this Court is willing to review Mr. Davenport's request is senseless. Mrs. Davenport has already testified that she will not consider having her surgery until she is sure that there is someone who can care for her sons. Therefore, the Court cannot simply wait until she has her surgery to make this determination. Moreover, Mrs. Davenport testified that it is *already* necessary for her to have more help due to the problems with her hip and her son's worsening medical conditions.

Given that Mr. Davenport is the only potential familial caregiver for his disabled brothers and for his elderly and sick mother, the Court finds extraordinary and compelling reasons to grant Mr. Davenport's request for compassionate release under § 3582(c)(1).

**B.  The § 3553(a) factors weigh in favor of Mr. Davenport's release.**

Mr. Davenport argues that his release is appropriate under 18 U.S.C. §3553(a) because of his troubled upbringing, his mental health and substance abuse issues, the fact that he does not pose a danger to the community, his appropriate release plan and because he has already served a substantial part of his original sentence.

The Government argues that Mr. Davenport's release is not warranted under §3553 because of his lengthy criminal history prior to his current incarceration. *See* Doc. 75 at 11-12. The government believes these prior acts are an integral part of Mr. Davenport's history and characteristics and represents a propensity for recidivism. *Id.* Moreover the government is concerned that granting Mr. Davenport early release when he has three years left to serve "would

undermine the need for deterrence and would not promote respect for the law or reflect the seriousness of Davenport's conduct." *Id*. Finally the government argues that his sentence already reflected a substantial variance from his applicable guideline range. *Id.*

Even if a court has determined that compassionate release is warranted under §3582, the court must first consider public safety and the factors under 18 U.S.C. §3553(a) before the individual can be released from custody. The first factor this Court must consider focuses on the Defendant's offense characteristics, and personal characteristics. The Court finds that the §3553(a)(1) factors, when weighed holistically, weigh in Mr. Davenport's favor. Certainly Mr. Davenport was convicted of serious crimes before the instant offense: in 1996, he was arrested for transporting currency derived from violations of the Uniform Controlled Dangerous Substance Act (PSR ¶ 35); in 1997, he was convicted of possession of cocaine (PSR ¶ 36); also in 1997, Mr. Davenport was convicted of conspiracy with intent to distribute marijuana (PSR ¶ 37); and finally in 1999, Mr. Davenport was convicted of possession with intent to distribute five kilograms or more of cocaine (PSR ¶ 38). All of these crimes were committed on or before the age of twenty-five, and none of these crimes were violent in nature. However, they were still serious offenses, and it is well established that drug trafficking can have a destabilizing and devastating effect on people and communities. Of course, Mr. Davenport's criminal history played a significant role in determining the sentence of which he has already completed over seventy percent. Mr. Davenport's instant offense was also serious: he pled guilty to trafficking drugs and using a firearm to do so.

However, while it is true that his offense conduct and criminal history is serious, the Court must also take into account the Defendant's *personal* history and characteristics under §3553(a)(1). As a child, Mr. Davenport experienced emotional, physical and sexual abuse. Doc.

51, ¶¶ 4-6; PSR ¶¶ 46-48. When he was born, his grandmother offered his mother money to "take him away" from the family because he was not white. PSR ¶ 50. His father's mental health issues, which were likely a result of his service as a World War II veteran, made his childhood chaotic. PSR ¶ 46. His father would kick and hit him, and this abuse escalated to become sexual in nature when his mother had to spend long hours working out of the home to support their family. PSR ¶ 47. His father died from surgical complications when Mr. Davenport was ten years old. PSR ¶ 46. Mr. Davenport was also abused by a babysitter at age seven. PSR ¶ 57.  At an early age he was exposed to drugs, alcohol, gang activity, and violence. *Id.* He therefore experienced mental health issues and substance abuse issues from an early age. PSR ¶¶ 57-59, 62. At age 13, as a teenager in Juarez, he began drinking alcohol and taking "pills." PSR ¶ 62. At age 16, a girlfriend introduced him to cocaine. *Id.* He has used heroine, methamphetamine, marijuana and ecstasy. *Id.* Due to his chaotic upbringing, Mr. Davenport was not able to attend school until 5th grade. PSR ¶65. He was unable to get his GED until he was incarcerated in 2005. PSR ¶ 66.

Nearly ten years ago at the time of sentencing, Mr. Davenport also had numerous health troubles: Mr. Davenport had limited movement due to traumatic injuries he received to his head, shoulder, ribs and legs in a serious car accident. PSR ¶¶ 55, 56. Mr. Davenport sustained a chronic health condition after a medication error made during one of his previous incarcerations in a prison healthcare system, for which he needed "vein stripping" as a part of a long-term treatment plan. Doc. 51 at ¶ 8. At the time of sentencing, Mr. Davenport had more than a dozen surgeries to strip more than 350 veins, and it was projected he would need at least eight more surgeries. *Id.*

This Court must consider Mr. Davenport's crime and criminal history, but the Court must also balance that inquiry with one into Mr. Davenport's personal history, his upbringing and social circumstance at the time of his crimes. While it is certainly true that Mr. Davenport committed serious drug crimes, it is also true that Mr. Davenport's childhood demonstrates that he was severely under-resourced as a child, exposed to drugs and violence at a very young age, factors which significantly contributes to criminal behavior.[11] These factors influence the Court's determination that a reduction in sentence would be consistent with the considerations of § 3553(a)(1).

This Court now evaluates Mr. Davenport's sentence under the standards set forth in § 3553(a)(2)(a). This Court is not the sentencing court and has the privilege of knowing Mr. Davenport at this point in his life after he has served over two-thirds of his term of imprisonment. Having reviewed all material submitted by both parties, the Court finds that the punishment that Mr. Davenport has borne so far reflects the seriousness of the offense, promotes respect for the law and provides just punishment for the offense of conviction. First, while the government argues that ten years is not a long enough sentence for Mr. Davenport, a ten-year sentencing for drug trafficking is statistically "long" in the Tenth Circuit. The Sentencing Commission reported for the 2020 fiscal year that the average sentence for drug trafficking violations in the Tenth Circuit is seventy-one months.[12] This average of course includes those

---

[11] *See, e.g.*, Stacey Bosick and Paula Fomby, "Family Instability in Childhood and Criminal Offending During the Transition into Adulthood," Am Behav Sci. 2018 Oct; 62 (11): 1483–1504 ("Thus we observe an accumulation of disadvantage wherein children from unstable family contexts are more likely to become involved with the criminal justice, and less likely to experience life events like marriage that might otherwise curtail that involvement.")

[12] United States Sentencing Commission, *Statistical Information Packet, Fiscal Year 2020, Tenth Circuit,* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2020/10c20.pdf at 13.

who trafficked less drugs than Mr. Davenport, but also those who trafficked significantly *more* drugs. Mr. Davenport has been incarcerated for one-hundred and four months.  Mr. Davenport's sentence reflects the seriousness of the offense he committed as his sentence will be at least thirty months over the average sentence for drug trafficking in the Tenth Circuit. Therefore, the Court also finds that Mr. Davenport's punishment has been just.[13]

Under § 3553(a)(2)(b) and (c), the Court should also determine whether the penal goal of deterrence has been met by Mr. Davenport's sentence, and whether further incarceration is needed to protect the public from him. In terms of deterrence, the legal and scientific communities are skeptical of any theory which purports that the length of a prison sentence directly correlates to how much that sentence deters a defendant's potential criminal activity. Studies demonstrate that longer prison terms produce only a limited deterrent effect that do not outweigh the social and economic costs of sentencing individuals to lengthy sentences.[14] In fact, the Sentencing Commission has found that deterring crime and protecting the public from future crime of a particular defendant, correlates much more significantly with the *age* of the defendant when they are released from prison than it does with any particular length of a prison sentence:

> Age exerted a strong influence on recidivism across all sentence length categories. Older offenders were less likely to recidivate after release than younger offenders who had served similar sentences, regardless of the length of sentence imposed. In

---

[13] The government also asserts that Mr. Davenport must serve his whole original sentence in order to promote respect for the law. However, it has provided this Court with no logical reason why an extra three years incarcerated promotes more respect for the law than the years he has already served, other than their assertion that it does. Therefore, the Court does not find this argument compelling.

[14] *See* National Institute of Justice, *Five Things About Deterrence,* June 5, 2016, https://nij.ojp.gov/topics/articles/five-things-about-deterrence ("Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes. More severe punishments do not "chasten" individuals convicted of crimes, and prisons may exacerbate recidivism.")

addition, for younger offenders there was some association between the length of the original federal sentence and the rearrest rates, as younger offenders with sentences of up to six months generally had lower rearrest rates than younger offenders with longer sentences. However, among all offenders sentenced to one year or more of imprisonment, *there was no clear association between the length of sentence and the rearrest rate*.[15]

Mr. Davenport is now fifty years old. He is well past the age in which criminal activity peaks.[16] In fact, for individuals in his ethnic and age group, his chances of recidivism are extremely low (7.5% chance of recidivism for Hispanic men aged 50-59, as opposed to a 38% chance of recidivism for Hispanic men who are below the age of 30).[17]

However, this Court does not have to rely on science or statistics from the Sentencing Commission to determine whether Mr. Davenport is likely to reoffend. Mr. Davenport's impeccable disciplinary record in prison and his rehabilitation while incarcerated serves to demonstrate he will not be a risk to the community should he be released. Mr. Davenport participated numerous rehabilitative courses while in prison. *See* Doc. 65 at 17-19. His individualized Needs Plan Program Review demonstrates that, by the Court's count, Mr. Davenport has participated in forty courses during her period in BOP custody. *See* Doc. 65; Ex. B-1. Highlights of his prison education have been his master gardening program, vocational training in horticulture, and custodial maintenance. Doc. 65 at 8. He now uses the knowledge he has gained from these programs and courses to tutor other prisoners. *Id.* He obviously has also developed a release plan: Mr. Davenport plans to reside with his mother so that he can care for

---

[15] United States Sentencing Commission*, The Effects of Aging on Recidivism Among Federal Offenders,* December 2017, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf, at 3 (emphasis added).

[16] *Id.* at 10 ("'the prevalence of offending tends to increase from late childhood, peak in the teenage years (from 15 to 19) and then decline in the early 20s'").

[17] *Id.* at 14.

her and his brothers. Doc. 74, Ex. 4. He has an open job offer from Raks Building Supply where he would work on a part-time basis as a forklift operator. *See* Doc. 65; Ex. A-5.

Mr. Davenport also has an extremely minimal disciplinary record while in prison, his only violation being a "300 series" violation which occurred a few days after arriving at prison.[18] *See* Doc. 65 at 10. This proof of Mr. Davenport's commitment to living by the rules is bolstered by a letter the Court received from Mr. Sampson of the Administrative Maximum Security ("ADX") Institution of FCI Florence. In his letter, Mr. Sampson wrote:

> I have been at ADX for 17 years in a supervisory position. I must say Carlos Davenport has been a model worker and a great asset, he has gone above and beyond while working for Laundry department as well as facilities department, on many occasions when I had no workers in my department, He volunteered from laundry to clean our department as well participate on projects we were working on. He has done an outstanding job keeping both departments operating day by day. He is very respectful and is a team player.

Doc. 74.5. The person described by Mr. Sampson is not the same person reflected in the criminal complaint in this case. Mr. Davenport is trusted to work in the highest security institution in the BOP. Doc. 65. The Court also recognizes the rarity of letters like this as it does not often see prison officials taking their time to vouch for the moral characters of inmates. The Court finds that Mr. Davenport's good disciplinary record and the courses he has taken while in prison demonstrate Mr. Davenport's commitment to rehabilitation. Therefore, under the standards set forth in § 3553(a)(2) the Court finds the potential danger to the community to be low should Mr. Davenport be released.[19]

---

[18] A "300 series" violation is considered of "moderate severity" on a scale in which "100 series" is of the greatest severity and a "400 series" violation is the least severe violation. Examples of a 300 series violation include insolence towards a staff member, failing to perform work as instructed by a supervisor, and failing to stand for count, etc. *See* 28 CFR §541.3.

[19] The final argument the government made on the §3553(a) factors is that Mr. Davenport already received a substantial variance when he was originally sentenced, and therefore he does

**CONCLUSION**

For the reasons reviewed above, Mr. Davenport's Motion for Compassionate Release (Doc. 74) is **GRANTED.** Under the authority granted to this Court by 18 U.S.C. § 3582(c)(1)(A)(i), the Court reduces Mr. Davenport's term of imprisonment to time served. The Bureau of Prisons is directed to release Mr. Davenport so that he may begin his five-year term of supervised release. The government shall serve a copy of this order on the Warden at FCI Florence.

_____
HON. DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE

---

not deserve compassionate release. This argument fails to compel the Court for two reasons: First, variances are not considered anywhere in the guidelines as a consideration to be used to inform the sentencing judge with respect to the §3553(a) factors. Second, Mr. Davenport was sentenced pursuant to an 11C1C plea agreement that the government, in fact the same attorney for the United States, agreed to because it served *both* parties interest at the time. *See* Doc. 39 at 10 (signature block for Attorney James R. W. Braun.) At the time, the government gave up the opportunity to request the most punitive sentence at the sentencing hearing in 2015, but Mr. Davenport also made concessions to have this deal: he waived his right to a jury trial and his right to appeal any sentence he may receive. Therefore, the Court does not believe the fact that he received a variance at sentencing has any particular weight in the §3553(a) analysis.